The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning everyone. The first argued case is number 19-2347 in Re Sorensen. Mr. Dorbish, good morning and please proceed. Thank you, Your Honor, and may it please the Court. Tom Dorbish on behalf of Appellant Irv Sorensen. The invention in this case is a new and useful kind of alarm system that can automatically predict when a department store is about to get busier and alert store personnel when the registers are about to get overcrowded. Now this is a remarkable invention because if anyone knows who stood in line at a cash register, this is a problem that still plagues most stores and there has not been a solution readily available. Yet the claim system solves this problem and it does so in a way that is totally unconventional. Human beings never tried to solve this problem in this way before and this particular solution would not even be possible for a human being to carry out in his or her mind. But isn't that the... It requires a specific... Mr. Dorbish, isn't this the problem with what happened, that in terms of carrying out the solution, the details other than count the people and ring an alarm are not set forth or distinguished from what's gone before. It's just that this is a computer capability and let's use it. Well, no, Your Honor. We would disagree. We think in this claim that the details of how to go from collecting shopper data, looking at the number of people entering the store, to this result of alerted store personnel when the cash registers are going to be overcrowded is explained in detail in a way that shows the intricate calculations that go on in this claim involving three sets of shopper data, two historic sets of data to determine a calibration coefficient and the way of figuring out how many people are in the store, a second set of data to figure out how much shopping is going on, and then applying the result of the analysis of that data to a third set of data in real time to figure out, based on the actual shoppers coming into the store, the number of people that are in the store and the number of items that are about to be purchased in the store. But haven't we had... And in addition to that... Counsel, I'm sorry. Haven't we had multiple cases... Yes, Your Honor. ...where the concept of just collecting data and reading something from the data has been deemed abstract when there is no advance as it relates to the actual computer processes employed? Yes, Your Honor. I think cases like Electric Power Group are on that point. But the difference between those cases and the case before us today in this claim is that this isn't merely collecting and analyzing data. It's collecting data that, you know, it's something about the physical world. It's analyzing that data for something important about the data. And then it's using the result of that analysis to inform the user about something that can then be translated into a practical benefit. So here you have unconventional data analytic techniques being applied to this shopper data. And from that, you're able to derive a more effective and more accurate way to determine when the cash registers are going to be overcrowded. And then that's communicated to the user, which can then be put into practice in the store itself. So I think rather than a case like Electric Power Group or SAP, the invest pick, where you had merely collecting and analyzing data, this case is much closer to the claims that were at issue in either CardioNet or Macro. In particular, in the CardioNet case, you had a sensor system that was collecting data. You then had a data analyzing element that was analyzing that data for something important about it. In that case, it was detecting the variances in heartbeats in order to detect arrhythmias. And then outputting that data to a user that told the user something important about what was happening in the world. In that case, whether or not somebody had a ventricular fibrillation or some other kind of heart condition. In this case, it's whether or not the cash registers are about to get crowded. So are you saying that collecting and analyzing data is not abstract as long as the analysis has a practical benefit for the user? Collecting and analyzing the data and using the result of the analysis in a practical way in the real world would not be abstract, particularly in the context of a technological device like we have here. There's nothing about the sensor system or the data analyzer computing device or the sensor system that is any different from things that are normal, pre-existing, and off-the-shelf. Well, each individual element. So, for example, well, I mean, I think to start, Your Honor, there are specific limitations in the claims as to how the sensor system needs to be used, where it has to be positioned, and the kind of data it collects that are more specific than just any off-the-shelf generic sensor system. But I think the greater point is that it's the combination of these elements running this particular kind of data analysis that really constitute a technological advance over the existing technology prior to this invention. As we discussed in the briefs, the prior methods of doing this, of determining when the cash registers in a store were going to become overcrowded, really amounted to a store person walking around looking at the store and just seeing whether, in their subjective opinion, it looked like things were about to get crowded. And what this invention can do... Right, but just because you can do something, Counsel, just because you can do something more efficiently or more quickly with a computer doesn't render what you're doing less abstract, does it? It does if you're doing it in a completely unconventional way. For example, Your Honor, if the claim was merely to detect with a sensor system the people entering the store, and all the data analytic elements said was, you know, determine whether help is needed, then that would be abstract. But here we have a step-by-step analytic process that automates something that was previously done with subjective judgment in an algorithmic way that is totally different than the way it was done before. The algorithmic steps that are carried out on this data analyzer device are not the steps that a human being would have or could have gone through in their head in the prior technology. There's no evidence on the record or even any argument that the way in which this data analyzer goes from collecting the data to producing this result was anything that was done before by human beings. So this is a different way of doing it. So the different way of doing it is by counting the number of people coming in the front door and the number of people leaving and when a particular person leaves. Is that the difference? Well, no, Judge Newman. There's quite a bit going on in the middle portion of these claims where the data is being analyzed. And I can walk through it briefly just to give an idea of the total depth of what's happening. So you start with two historic sets of shopper data, one that looks at when people enter and when people leave to determine the average trip length. And in addition to that, the claims also discuss creating what's called a calibration coefficient because the actual people being detected coming into the store are detected based on an electronic signal from, for example, a cell phone in their pocket. So the system doesn't detect everybody coming into the store. It only detects certain people. So the first thing that has to happen is you have to look via cameras or something at the actual entrance and some sort of technician would have to count the people coming into the store and then calibrate the device to create a coefficient to determine the actual number of people entering the store based on the number of signals detected. You then have to look at transaction log data to determine how many items are being purchased at any given time in the store and also at the number of people entering the store at that same time. And by doing that, you can figure out a relationship between the number of people in the store and the number of items that are going to be purchased at any given time. And in doing so, you create two metrics that can then be used and applied in real time on a third set of data, which is the actual active measurement of the number of signals coming into the store, which you can use that calibration coefficient you derived to figure out the actual number of people in the store. And then you can use this relationship between the number of people and the number of items purchased to determine the actual purchasing volume that's going on in the store. And once you've determined that either the number of people or the number of items to be purchased has gone over a set threshold, the system then knows to weight the length or a time based on the average length of a shopper trip so that it knows the proper time to issue its signal based on how long people tend to spend in the store. So that way, if there's a huge influx of people coming into the store, the system doesn't start alerting the user right away. It waits until those people are about to get to the cash register. And so in that way, it's quite a bit more than just calculating the number of people that were coming into the store. And that's actually a very important point because as is mentioned in the prosecution history, there were existing systems that could just count the number of people coming into the store. So to Judge O'Malley's point a moment ago, this claim is really a technological advance over those prior systems as well. This is a better method of doing something that was done in the past, a better and different method. It goes beyond just doing it on the computer. It's doing it in an unconventional way to create a more accurate and more useful result. And the difference, just to be clear, is that it counts the people who have a cell phone in their pocket. Is that the difference between just counting the people coming in? So for the aspect of the claim that's counting the number of people in the store, it would be counting the number of people. It would be calibrating it based on the difference between the number of people who come in with the cell phone in their pocket versus in order to sort of round up to the total number of people in the store. But then it's also calculating the average trip length of those people from the time they enter to the time they leave so that it knows not only how many people are in the store but how long do people tend to stay in the store. And that's also, in addition to all of that, there's also the purchasing aspect of this where the system automatically calculates the amount of purchasing that's going on at any given time, the number of items that are going to be purchased. And from that, it can also derive the volume of shopping that's happening, which also helps it accurately predict when more store personnel are needed at the check. Mr. Derbyshire, this is Judge Toronto. Among the information that is collected as part of the claim system, what if any of that was previously collected? So I'm thinking in particular in Diamond Against Deer, it was rather important, or at least it was important as later viewed by the Supreme Court in Alice, that there was constant monitoring of the temperature in the mold that had not previously been done before, at least assertedly had not previously done before, and that was a new kind of information collection, one might say. What if any new information is being collected here in light of the written descriptions acknowledgement that tracking customer entry into a retail environment and transaction log data were old? Well, one point on that, Your Honor, transaction log data itself was old and known, but using it for the purpose of determining how busy the cash registers were getting, that's a new advance for this system. None of the prior art systems or the existing technology used transaction log data for that purpose. The other aspect of it that's a new kind of collection would be the counting of the trip length, which helps the system to then determine the time delay to put on the alert signal. That was not something that was done in the prior art or the existing technology before this invention either. Just to be clear, there's nothing in the written description or the record that says, well, yes, of course stores had been noting average duration of customer presence before. No, Your Honor. There's nothing in the actual prior arts or in the written description that the customer trip length was actually being determined in order to calculate this volume of shoppers going to the check stands. That's a new invention. Yes, I think that wasn't quite my question. My question would have ended before you used the words in order to. That is, I guess I would have assumed that it's just an assumption on my part that it's rather old to know how long on average customers stay in the way that websites are very, very interested in how long viewers stay on the site. Putting aside the purpose for which that information is used, does the record tell us anything about whether the information about average or some kind of information about customer lingering time was collected in the prior art? I don't believe there's anything in the record specifically about that data being collected in the prior art, Your Honor. Okay. Well, I know I'm now into my rebuttal time, but there are no further questions from the panel. Is the panel having more questions at the moment? We'll save this for rebuttal time. That's fine with me. Thank you. Okay. Then let's hear from the office. On behalf of the office, Mr. McBride. Good morning, Your Honors. May it please the Court. Your Honors, what we have here in this appeal is a fairly straightforward ALICE two-step analysis. Under ALICE Step 1, the claims here are directed to an abstract idea of organizing human activity, specifically a system and a method for collecting and analyzing shopper data to determine if extra help is required in a store. And the key inquiry under ALICE Step 1 is whether the claimed invention as a whole is directed to improving the functioning of the claimed computer components or what we have here, whether they're just being used as basically tools to carry out the abstract idea. And here we've got four fairly basic computer components. We've got a sensor that can send some wireless signals of a customer. We've got a data analyzer that can take that data and perform some fairly basic functions to calculate the number of shoppers in the store and the number of projected items to be purchased. There are some cameras that can detect images of customers as they enter and exit the store. And then there's an alert device which, if it's triggered, can give either a fairly basic alert,  so I think under ALICE Step 1, these claims don't pass muster. Is it your position that any application that is directed to organizing human activity is going to be unpatentable? Well, if it's directed to organizing human activity, the claims, to become patentable, you've got to have something else in your claim. Like under ALICE Step 2, for example, you could have some additional elements that basically amount to something significantly more that can transform that abstract method of organizing human activity into something patentable. So you'd have to have some additional limitations. For example, with these specific claims, if there were some improvements in the underlying computer components, if there's something specific to the sensor or the data analyzer or the cameras or the alert device, there's something specific as to how each of those components operated either individually or if you looked at how they operated as a whole, if there's something being done that was unconventional and it was rooted in computer technology, some type of improvement in the actual technology and not just an improvement in the abstract idea itself, that could be patent eligible, even if it did have some recitation of something that could be characterized as organizing human activity. But that's just not the case here. How do we know, Mr. McBride? And this is really, we get to the point where there is some stage at which these various steps and combinations do indeed cross the Section 101 line. Now the record says, your brief I believe says, that there was a rejection under Section 103 and the examiner withdrew it. Now under 103, I assume, we again don't have the history before us, I assume that references would be cited to demonstrate, to support each of the points that you've just been making, that it's known and it's told to do this and it's known and it's told to do that, but we, the office, don't need to bother to go through all of this because your claims are too broad or stated too broadly and it's been puzzling to see except I suppose the answer is that it's much easier just sweepingly to say, oh, this whole business is just stated generally, generically, so we don't have to bother to cite any references. Don't trouble us step by step with prior art. It starts to look as if this fits into that category and that the examiner started out with what I assume was a 103 rejection and created citations of references and just withdrew them. Where does that leave us in terms of trying to provide some sort of guidance, some sort of rule that the public can follow as to what needs to be in the specification and here we're told, the council tells us, that this is different, it's carried out in a different way and yet nothing from the office tells us whether it is or isn't different. Yeah, yes, your honor. You know, I think, you know, section 101, it's a separate statutory basis and I think the office and the examiner here, you know, did attempt to make a rejection under 103 based on the prior art and I don't know the exact reason why they withdrew that rejection, but I presume it's because upon, you know, closer reflection, maybe an argument that Sorenson made, they were persuaded that that rejection wasn't sound for some reason and, you know, that's not that unusual. If it was withdrawn, that means that no, we're not rejecting this for obviousness. This is not obvious. Exactly, your honor. However, then why aren't they entitled to patent? Why is this a matter of claim content and sufficient detail rather than whatever it is, it doesn't cross the line? Well, I think it's just a simple matter of section 101 is another statutory basis. The office has to make sure the claims pass muster and we've got to follow Supreme Court precedents under Alice and this court's precedents and, you know, the office does their best to apply those cases and do a rigorous analysis under section 101, and I think that's what was done here. I think if you look at the Alice step one and the step two analysis, the claims just, you know, don't pass muster under either step. I believe Sorensen's counsel, you know, conceded that they didn't really invent any of these basic components, either the sensor or the data analyzer or the cameras or the alert device, and they're disclosed in the specification at a very high level. If you look at paragraphs 23 through 30 of the specification, they're just basically, you know, referred to, you know, without any specific detail as to how they're actually working. Well, you're telling us it's an obvious combination. It doesn't sound like 101. Well, it's a little different. I think what I'm saying here is that these components, the way they're described in the specification and the way they're used, they're used in a manner that's well understood, routine, and conventional. We're not making any prior arts rejection. We're not saying they're anticipated or obvious, but the manner in which they're being used for these determining and calculating steps, they're being used in a manner that appears to be well understood, routine, and conventional. And Sorenson's Council doesn't seem to argue that there's anything inventive going on with any of these individual components. Mr. McBride, this is Judge Toronto. Can I ask you to address CardioNet and, in particular, why you think CardioNet is properly distinguished here and, I guess, still more particularly, whether you understand CardioNet to have involved a technologically, arguably innovative information collection technique? Yeah. So CardioNet, that's the case that Sorenson cited in the notice of supplemental authority. It's an Alice Step 1 decision. The technology in that case was an improved medical device that used a series of kind of new unconventional steps, such as having the device actually detect the heartbeats and determining whether they were in some arrhythmic fashion. And it resulted in a technological improvement. So it achieved, like, a faster, more accurate, and clinically significant detection of two specific medical conditions using steps that were not done conventionally in the prior arts. What very specifically was the step not done in the prior art? I believe-let me check that opinion. I've got it right here. I believe there's a step- Let's see. It's got a- You didn't submit a response to the Rule 28A letter. Is that right? No, we did not. We saw the letter. I mean, we were thinking about it, but we thought we could address it at oral argument if it came up. But it's got these steps. It's got a beat detector to identify a beat-to-beat timing of a cardiac activity, a ventricle beat detector to identify ventricle beats in the cardiac activity, and then it's got this variability determination logic to determine a variability in the beat-to-beat timing of a collection of beats. And then it uses that information to determine whether there's-to detect two specific medical conditions. And I believe, in this opinion, this court found that those steps were not done manually by a physician. But it actually had complexes that adjusted the defibrillator, right? I believe so, yeah. Yeah. It's doing some type of event generation in response to the variability in the beat-to-beat timing. So those claims clearly seem very different from the claims we have here because they're really improving. They're directed to, like, a technological improvement in this cardiac device, whereas here the claims are really directed to kind of organizing the interactions between customers, you know, shopping in a store and how many staff you deploy to service those customers, either on the store floor or opening up a new cash register. And it's using basic components to just do kind of basic computer functions like, you know, detect wireless signals or some basic analysis of the data to determine the number of shoppers in the store or the projected number of items to be purchased. There's no improvement in any of the underlying computer components that are being used. No, but Mr. Jarvis says that this hasn't been done before. That may be true, but just the fact that you have a new or improved or non-obvious abstract idea, you still have an abstract idea. And under this course, we cited a bunch of cases in our brief, like SAP America versus Investpick and Synopsys, Fementor Graphics. This course has been clear that just because you have a new and improved or non-obvious abstract idea, it doesn't make your claim patent-eligible. You need something more, some additional information. Some additional, you know, technological improvement to, you know, the underlying computer technology. So you're saying that if it fails Section 112 one way or another, then it also fails 101? Oh, 112? For enablement and written description, you said that it's just presented broadly. Well, it is presented broadly. I don't think there was a 112 rejection here. No, there wasn't. You can see what's troubling me, that we get to the point where we have no prior art, we have no analysis of any difference or any distinction. Counsel tells us that this is new, this one hasn't been done before, it couldn't be done before, and that there are elements, strong elements of novelty and unobviousness, and the offices remain silent, apparently by choice, since, again, the record shows that there was a 103 rejection, which was then at one stage or another withdrawn. Our record doesn't say what that stage is. You're leaving it to us to decide. Well, it's obvious to me that you count the people one way or another. Yeah, I think it's just the fact that with Section 101 and patent eligibility is a separate statutory requirement, separate and apart from anticipation and obviousness, and while there, you know, sometimes there could be, you know, a prior art rejection in combination with a 101 rejection, you know, there's oftentimes there's just a standalone 101, and we just look at the merits of that rejection and see if it's, you know, if it stands up under the ALIS two-step framework and the precedence of the Supreme Court in this court, and I think here the claims just don't pass muster under ALIS Step 1 or 2. Can I just ask, I'm not sure this matters at all, but in the board's opinion, footnote 2 refers to a 112 rejection, the examiner having declared it moot. Do you know what that's a reference to? I apologize. I am not familiar with the basis for the 112 rejection and why it was deemed moot. Okay. Sorry, I can't answer that question for you. I don't have anything further to talk about. I'm happy to answer any questions if anyone has anything additionally you'd like me to address. Any more questions for Mr. McBride, another panel? Not for me. None here. All right. Okay, thank you. I'll yield the rest of my time. Thank you very much. Okay. Thank you, Mr. Dervish. You've saved three minutes for rebuttal. Thank you, Your Honor. Just a few points on rebuttal. First, I'd like to retract the earlier statement that I made to Judge Toronto about the calculation of trip lengths. It was actually disclosed in the prior record, the computation of shopper trip lengths via one of Mr. Sorenson's earlier patent applications. However, to the analogy that Your Honor drew to Diamond v. Deere and the monitoring of the mold temperature in that case, the analogy here would be that while shopper trip length computation was disclosed in the prior record, the continuous monitoring of shopper trip length in real time, which is what's being claimed in the patents here, in the claims here, there is no disclosure of that actually being measured or collected or done in the prior art. Likewise, in Deere, it was the continuous monitoring of the mold temperature that was the unique feature that was being collected in that case. So I think there is still an analogy to Deere in that regard. But moving on to a few points that Counsel for the Director made in his argument. First, with regard to organizing human activity, it appears that this is reflected in the Board's opinion as well as in the Director's briefing that the contention seems to be that a method of organizing human activity can never be patent eligible at ALICE Step 1. And that doesn't really seem to comport with Supreme Court precedents, the way ALICE interpreted methods of organizing human activity and the sort of statements against creating categorical rules against patents in certain fields. It doesn't seem correct that no method of organizing human activity could ever be patent eligible under ALICE Step 1, no matter how concretely they're claimed. And that really gets to the heart of this issue because these claims are very concrete in the steps they recite. And as we discussed in our briefing, this really isn't a method of organizing human activity at all because it doesn't dictate human behavior in any way. It simply monitors human activity and issues a useful result. But I think the larger point that I want to make before finishing is that the outcome of this case is really controlled closely by the CardioNet opinion. And as counsel for the Director discussed, the advance in that claim in CardioNet was not to any of the technological devices that were claimed in the claims. The advance was in the data processing. It was in how the beat-to-beat variability was monitored. And it was the result of those calculations that constitute a technological advance in that device. Likewise, here in this claim, the advance is a technological advance in the device based on this new and useful kind of data processing that's going on. So if there's no further questions, I thank the panel for its time. Any more questions for Mr. Dervish? No, thank you. No, thanks. Okay, thank you. Thanks to both counsel. The case has taken every submission.